

DOCKETED
SEP 1 8 2002

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

FILED
SEP 1 6 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| MARILYN CARSON, Individually and On Behalf of All Others Similarly Situated, ) ) ) | Master File No. 02 C 2976 |
| Plaintiff, ) ) | Judge Joan H. Lefkow<br>Magistrate Judge Geraldine Soat Brown |
| vs. ) ) ) | |
| NEOPHARM, INC., JOHN N. KAPOOR and IMRAN AHMAD, ) ) ) | |
| Defendants. ) ) | |
| ——————————————— ) | |
| In re NEOPHARM, INC. SECURITIES LITIGATION ) ) ) | |
| ——————————————— ) | |
| This Document Relates To: ) ) | |
| ALL ACTIONS. ) ) | |
| ——————————————— ) | DEMAND FOR JURY TRIAL |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

32

Lead Plaintiff Larson Capital Management files this Consolidated Amended Class Action Complaint ("Complaint") pursuant to the Court's Order Consolidating Related Class Actions, dated August 1, 2002.

## NATURE OF THE ACTION

1.      This class action is brought by plaintiff on behalf of itself and all other similarly situated persons who purchased the common stock of NeoPharm, Inc. ("NeoPharm" or the "Company") during the period October 31, 2001 through April 19, 2002 (the "Class Period"), asserting claims under the Securities Exchange Act of 1934 ("Exchange Act") for defendants' series of false and misleading statements regarding NeoPharm's experimental drug Liposome Encapsulated Paclitaxel ("LEP"). Defendants are NeoPharm and three of its top officers and directors who directly made, or are otherwise responsible for, false and misleading statements regarding the status of LEP, which had the effect of artificially inflating NeoPharm's stock price during the Class Period.

2.      Starting well before the beginning of the Class Period, NeoPharm and its top officers and directors publicly represented that LEP was on track to becoming an approved U.S. Food and Drug Administration ("FDA") compound and a new and revolutionary method of administering the existing anti-cancer drug paclitaxel by encapsulating that drug in a liposome (which is typically composed of phospholipids). At the start of the Class Period, LEP was NeoPharm's lead product in development, and throughout the relevant time period, LEP was the only NeoPharm compound to have entered Phase II clinical trials. Defendants publicly reported that NeoPharm's early Phase I testing of LEP had been successful, and based on this publicity defendants generated significant investor interest in NeoPharm.

3.      Also beginning before the start of the Class Period, NeoPharm had licensed the development of LEP to Pharmacia Corporation ("Pharmacia"), and Pharmacia had begun a Phase II clinical trial of LEP by October 2000. Thereafter, Pharmacia provided NeoPharm with quarterly reports on the status of these clinical trials, which by the start of the Class Period revealed that LEP was failing the Phase II trials. Thus, by the start of the Class Period continued testing of LEP showed that as currently formulated LEP was providing no clinical benefits during the Phase II trials that were underway before, and continuing during, the Class Period. Rather than publicly reveal this

adverse state of affairs, defendants concealed this important information from the investing public, while continuing to represent publicly that clinical trials for LEP had been, and were continuing to be, successful.

4.      In addition, unbeknownst to investors, during the Class Period NeoPharm was fighting with Pharmacia over the manner in which Pharmacia had developed LEP.  As ultimately revealed by defendants' post-Class Period admissions, Pharmacia was unable to successfully perform the tasks needed to develop LEP, and moreover, Pharmacia had substantially reformulated and materially changed the formulation of LEP.  As a result of these problems, NeoPharm was required in approximately January 2002 to take this defective LEP back into its own laboratory in an attempt to "fix" LEP by reformulating it yet again.

5.      Although defendants subsequently admitted that they were aware of these extremely negative facts at the time they were occurring during the Class Period, defendants' positive statements during the Class Period failed to disclose to investors: (1) that test results known to defendants during the Class Period showed LEP was unstable and provided no benefits during Phase II clinical trials; (2) that the earlier successful Phase I test results for LEP were inapplicable to LEP as currently developed because it was a different formulation; (3) that as currently developed, LEP would need to be reformulated again in an effort to fix it; and (4) that the entire LEP project was set back to the earliest clinical stage requiring new Phase I dose escalation studies.

6.      In January 2002 defendants made public disclosures that only hinted at these extremely adverse facts, when they announced that there had been unaccounted-for-delays in the LEP development timeline, such that Phase III testing of LEP would not be occurring in early 2002 as investors had been anticipating.  As a result of this announcement, the price of NeoPharm stock fell sharply as this negative information was absorbed by the market in the days following this January 11, 2002 disclosure.  But defendants' public statements downplayed the nature of the potential LEP delays by telling investors that the problem was one of timing, which they falsely represented was an issue solely controlled by Pharmacia (even though NeoPharm was in the process of taking LEP back into its own laboratory in an effort to reformulate and fix it).  Defendants also continued to publicly represent that results of LEP testing showed success, when current testing was

a failure and earlier successful test results related to an LEP that was now one or two generations removed from the LEP that defendants were working on reformulating.

7.     Finally, on April 19, 2002, defendants revealed that the Company had significant problems, not only with its defective LEP, which had shown no benefits in Phase II clinical testing and which needed to be reformulated and fixed, but also in connection with NeoPharm's relationship with Pharmacia, such that NeoPharm was pursuing its legal rights under its licensing agreement with Pharmacia by taking the longstanding dispute over LEP development into arbitration. In response to this surprise announcement, NeoPharm's stock price again dropped substantially.

8.     Plaintiff and similarly situated class members were damaged when purchasing NeoPharm stock during the Class Period at artificially inflated prices, and plaintiff has brought this class action seeking a remedy for defendants' misconduct and violations of the federal securities laws.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. §240. 10b-5.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and §27 of the Exchange Act, 15 U.S.C. §78aa.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). NeoPharm maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

12.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.    Lead Plaintiff Larson Capital Management purchased 52,500 shares of NeoPharm common stock during the Class Period and has been damaged a result of the wrongful conduct complained of herein.

14.    NeoPharm is a Delaware corporation with its principal place of business at 150 Field Drive, Suite 195, Lake Forest, Illinois 60045. NeoPharm is a biopharmaceutical company engaged in the research, development and commercialization of drugs for the treatment of various forms of cancer. NeoPharm is developing a portfolio of seven anti-cancer drugs, three of which have advanced to clinical trials.

15.    Defendant John N. Kapoor has been Chairman of the Board of Directors of the Company since its formation in 1990. Defendant Kapoor is the largest single shareholder of the Company, owning directly or indirectly more than 37% of NeoPharm's outstanding common stock through which he controls the Company.

16.    Defendant James M. Hussey was, at all times relevant hereto, President, Chief Executive Officer, and a Director of the Company.

17.    Defendant Imran Ahmad was Vice President of Research and Development with the Company and is also described as NeoPharm's Chief Scientific Officer in the Company's October 31, 2001 press release.

18.    Defendants Kapoor, Hussey, and Ahmad are referred to herein as the "Individual Defendants."

19.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein – unless attributed to a specific defendant – are the collective actions of the narrowly-defined group of Individual Defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its LEP business, as alleged herein. Said

defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company's LEP business, and approved or ratified these statements, in violation of the federal securities laws.

20.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the Nasdaq National Market System, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants participated in the drafting, preparation and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with NeoPharm, each of the Individual Defendants had access to the adverse undisclosed information about NeoPharm's LEP development prospects as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about NeoPharm and its business issued or adopted by the Company materially false and misleading.

22.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to

prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

23.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of NeoPharm common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (1) deceived the investing public regarding the status of NeoPharm's LEP development and the intrinsic value of NeoPharm common stock; (ii) deceived the investing public in connection with the benefits related to LEP; and (iii) caused plaintiff and other members of the Class to purchase NeoPharm securities at artificially inflated prices.

## HISTORICAL BACKGROUND AND PRE-CLASS PERIOD STATEMENTS

24.     Before the start of the Class Period, NeoPharm publicly represented that LEP was a potentially revolutionary method of administering the existing anti-cancer drug paclitaxel by encapsulating it in a liposome. Paclitaxel is marketed by Bristol-Myers Squibb Company under the trade name "Taxol®" and is used in the treatment of a number of cancers, including breast, ovarian and lung cancer. Taxol® is the largest selling anti-cancer drug in the world, with sales of $1.5 billion in 1999.

25.     Despite paclitaxel's wide use and its anti-tumor characteristics, its effectiveness has been limited both by side effects, such as nausea, vomiting, hair loss and nerve and muscle pain, and by a long infusion time. Because of the chemical characteristics of paclitaxel, it cannot be introduced into the body unless it is first formulated in a toxic mixture of castor oil and ethanol, which requires premedication of the patient. NeoPharm represented that LEP does not require administration with castor oil and ethanol, thus reducing the need for premedication. NeoPharm also publicly stated that because LEP is purportedly stable, it is easy to store, prepare and administer. NeoPharm further represented that another potential advantage of LEP is its ability to reduce multi-drug resistance, which is the resistance to cancer drugs developed by cells that have been exposed to several rounds of chemotherapy.

- 6 -

26.     On or about February 19, 1999, NeoPharm entered into a worldwide collaborative relationship with Pharmacia to develop and commercialize two products, one of which was LEP (the "Pharmacia Agreement"). Under the Pharmacia Agreement, Pharmacia obtained exclusive rights to develop and market LEP throughout the world, and assumed responsibility for, and the costs associated with, the clinical development and regulatory filings for LEP. The Pharmacia Agreement provided for up to $69 million in payments to NeoPharm from Pharmacia. Through August 25, 2000, Pharmacia paid to NeoPharm $22 million, including the purchase of $8 million of NeoPharm common stock

27.     LEP was NeoPharm's lead product in development, and was the only NeoPharm compound to have entered Phase II clinical trials. The continuing success of LEP clinical trials was critical for the Company, because prior attempts by others to utilize a liposome as a drug delivery vehicle had failed, and many of NeoPharm's products in development were designed around this liposome encapsulation system. Accordingly, the current status of LEP clinical trials was highly material information, and if successful would validate the proof of concept surrounding NeoPharm's liposome encapsulation drug delivery system.

28.     On November 14, 2000, in a press release disseminated through *Business Wire*, the Company announced its financial results for the quarter ended September 30, 2000. Commenting on the results, defendant Hussey stated: "We also made significant progress in both our pre-clinical and clinical programs and have begun to expand our infrastructure to support our electrostatic liposomal platform development. We plan on placing a number of compounds in our liposomal system in the coming months."

29.     On November 14, 2000, the Company filed its Form 10-Q for the quarter ended September 30, 2000 with the SEC. The Form 10-Q represented that:

Liposomal Encapsulated Paclitaxel

Product Description. LEP is a liposomal encapsulated formulation of the widely-used cancer drug, paclitaxel. Paclitaxel is marketed by Bristol-Myers Squibb Company under the trade name "Taxol®" and is used in the treatment of a number of tumors, including breast, ovarian and lung cancer. Despite paclitaxel's wide use and its anti-tumor characteristics, its effectiveness is limited by its side effects, which can include nausea, vomiting, hair loss and nerve and muscle pain. Because of the chemical characteristics of paclitaxel, it cannot be introduced into the body unless it

- 7 -

is first formulated in a toxic mixture of castor oil and ethanol which requires premedication of the patient. In addition, paclitaxel must be infused over a period of at least three hours.

We believe our technology may overcome many of the current limitations of paclitaxel by utilizing cardiolipin, a naturally occurring negatively charged lipid found in cardiac tissue, to increase the solubility of paclitaxel. We have been able to standardize the preparation of cardiolipin through the development of a proprietary form of synthetic cardiolipin. Using cardiolipin eliminates the need for administration of castor oil and ethanol and reduces the need for the accompanying premedication. Since paclitaxel has a positive charge and cardiolipin has a negative charge, cardiolipin electrostatically combines with the paclitaxel to form a stable product that can be freeze dried and easily reconstituted. Based on preclinical studies, we believe another potential advantage of LEP may be the ability of cardiolipin to overcome multi-drug resistance, which is the resistance to cancer drugs developed by cells which have been exposed to several rounds of chemotherapy. As a result, we may be able to significantly increase the effectiveness of LEP against tumors, thereby maximizing the killing of otherwise resistant cells.

Development Status. LEP is being developed for various solid tumors. We believe LEP is the first, and only, liposomal form of paclitaxel to enter clinical trials. Enrollment of patients in our Phase I/II clinical trials for LEP was completed in April 2000. These Phase I/II trials involved the treatment of 31 cancer patients, none of whom were then responding to other forms of treatment. Our Phase I/II trials have provided evidence that LEP may be able to be administered at higher levels than paclitaxel is currently administered, with fewer side effects. Although not designed to measure efficacy, six patients in the Phase I/II trial experienced tumor reductions greater than 35%. The tumors in twelve other patients did not increase in size after 12 weeks, and in four of these twelve patients, the tumors were still stable in size one year later. Some patients received significantly more cycles of LEP than can be given with unencapsulated paclitaxel, including two patients who received greater than 30 cycles of LEP. None of the patients showed signs of the nerve and muscle pain commonly associated with paclitaxel, and most patients did not experience the hair loss or nausea often associated with paclitaxel treatment.

Currently, our collaboration partner, Pharmacia is initiating large scale multi-center, multinational Phase II/III clinical trials. These Phase II/III trials will assess LEP as both a single and combination therapy for a variety of solid tumors to determine its safety and efficacy.

30.     On March 29, 2001, in a press release disseminated through *Business Wire*, the Company announced its results for the quarter and year ended December 31, 2000. Commenting on the results, defendant Hussey stated: "The year 2000 was a breakthrough year for NeoPharm ... our partner, Pharmacia, initiated Phase II/III clinical trials for Liposome Encapsulated Paclitaxel ("LEP"), for which we received a $3 million milestone payment."

31.     On May 9, 2001, in a press release disseminated through *Business Wire*, the Company "confirmed ... that the clinical development program for LEP is continuing in key oncology indications."

## CLASS PERIOD MATERIALLY FALSE AND MISLEADING STATEMENTS

32. The above statements regarding the status of LEP testing and NeoPharm's relationship with Pharmacia were still alive at the start of the Class Period in that defendants had not corrected these prior positive statements although by October 31, 2001 they had become false and misleading under the conditions known to defendants at that time. As a result, these earlier public statements regarding LEP and Pharmacia's development of LEP were still having a positive effect on NeoPharm's stock price, and because they were no longer true, they were operating to artificially inflate the price of that stock. Specifically, the following events had occurred which rendered these prior statements no longer true:

(a) Pharmacia was not studying the same formulation of LEP, so that its study results would not be applicable to NeoPharm's LEP approval.

(b) Under the licensing agreement with NeoPharm, Pharmacia had begun the Phase II clinical development program by October 2000 pursuant to an investigational drug application (IND) initiated by NeoPharm for its own Phase I development. The IND was for the same LEP formulation as originally developed by NeoPharm. During its Phase II testing of LEP, Pharmacia had failed to reproduce the required test article (i.e., the original NeoPharm Phase I formulation) for the IND clinical studies, thereby undermining the validity of all clinical testing under the development program to date. As discussed below, this adverse information was reported to and known by defendants at the start of the Class Period, in connection with periodic reporting Pharmacia provided to NeoPharm regarding the status of LEP clinical trials.

(c) NeoPharm's reportedly successful prior Phase I clinical trials of LEP were inapplicable to the current form of LEP as they related to a different formulation of LEP and not to the same LEP formulation being currently developed.

(d) LEP as currently being developed was not efficacious in reducing the size of tumors or halting their growth.

(e) NeoPharm had to scrap the current LEP formulation, which was not efficacious in reducing the size of tumors or halting their growth, in order to again reformulate LEP in an effort to make it perform properly.

- 9 -

(f)      Any reformulated LEP would need to undergo renewed Phase I clinical trials, such that the development status of LEP was now returned to preclinical levels and the prior proof of concept that LEP could pass Phase I trials was no longer valid as to the current LEP.

33.      On October 31, 2001, defendants caused NeoPharm to issue a press release through *Business Wire* containing false and misleading statements regarding the purported success of LEP test results:

> NeoPharm today announced that clinical data for liposome encapsulated paclitaxel (LEP) were presented at the AACR-NCI-EORTC meeting in Miami, Florida on Tuesday. In the study, LEP is administered weekly for six weeks using an intravenous infusion.... LEP is being developed by Pharmacia Corporation under a licensing agreement with NeoPharm.
>
> "In the Pharmacia study involving weekly dosing of LEP, an extended terminal half-life was observed", said Imran Ahmad, Chief Scientific Officer of NeoPharm. "This is a significant improvement because more paclitaxel appears to available to attack tumors over the six week administration schedule."

34.      On December 19, 2001, UBS Warburg issued a report on NeoPharm, after its analyst Andrew Gitkin had discussions with defendants, which was based on and repeated information defendants provided to Gitkin. This report initiated coverage of NeoPharm with a "Buy Rating," noting:

> *      Our Buy rating is based upon strong expected sales [of NeoPharm's] lead product, liposomal encapsulated paclitaxel (LEP), for the treatment of breast and non-small cell lung cancer (NSCLS).
>
> *      We expect the company's collaborative partner, Pharmacia, to commence Phase II/III trials for LEP in early 2002.

35.      Also on December 19, 2001, FAC/Equities initiated coverage of NeoPharm with a "Buy Rating" based upon the information defendants provided, including their pre-Class Period positive statements regarding now-inapplicable test results for LEP:

> NeoPharm's most advanced product is liposome-encapsulated paclitaxel (LEP), a liposomal version of Taxol, a $1.6-billion anticancer drug. Pharmacia, the licensee, is testing LEP in Phase II studies. In Phase I/II, LEP showed anti-tumor activity, a prolonged half-life, but no peripheral neuropathy or muscle pain, and low rates of alopecia and nausea. By contrast, Taxol is associated with high rates of these side effects: neuropathy (60%), muscle pain (60%), alopecia (87%), and nausea and vomiting (52%). A pivotal, Phase II/III trial in metastatic breast cancer is expected to start during the first half of 2002.

- 10 -

36.     Defendants' foregoing statements in ¶¶33-35 above were false and misleading when made. At the time defendants made their representations to the public about LEP, they knowingly or recklessly failed to disclose adverse material information which made their representations false and misleading. Defendants failed to disclose, among other things, that:

(a)     Pharmacia's Phase II trials of LEP had failed to show any beneficial results as both NeoPharm and Pharmacia subsequently admitted at the end of the Class Period (*see* ¶¶50, 51, 53, *infra*).

(b)     NeoPharm was well aware of the lack of success Pharmacia was having with LEP Phase II clinical trials, because those clinical trials had commenced at least by October 2000 and defendants were kept updated as to the results of those trials as required by the Pharmacia Agreement, which provided: "[Pharmacia] shall deliver to NeoPharm reports, at least quarterly, providing NeoPharm with sufficient information so as to allow NeoPharm to be adequately informed as to the strategic development of the Compounds and the Products."

(c)     Pursuant to this provision of the Pharmacia Agreement defendants had repeatedly received quarterly reports indicating that the Phase II clinical trials of LEP had been unsuccessful.

(d)     Contrary to defendants' October 31, 2001 public statements that Pharmacia's test results showed LEP had an extended terminal half-life that was a significant improvement because it meant more of the drug paclitaxel was available to attack tumors in patients, the test results had actually shown an alarmingly broad range for terminal half-life, from exceedingly low to extremely high values, actually representing a gross lack of uniformity in the amount of paclitaxel available to attack tumors in patients and, moreover, the wide range of terminal half-life data indicated that the LEP used in the study was unstable and needed reformulation.

(e)     The LEP test results which NeoPharm publicly referred to on October 31, 2001 indicated that ongoing LEP testing was contrary to FDA guidelines which stated that if a drug is either unstable or not reproducible, then the validity of any clinical testing would be undermined because one would not know what was really being used in patients, and moreover, the studies could pose significant risks to participants.

- 11 -

(f)     The Phase II test results which defendants referred to on October 31, 2001 actually contradicted early Phase I studies of LEP, because the latter studies showed toxicity in patients at 90 and 120 dosage levels, where previous Phase I dose escalation studies reportedly showed no similar toxicities in patients below the 175 dosage level, which was a further indication that LEP as currently formulated and developed did not have the benefits defendants were ascribing to it, that LEP was failing the Phase II clinical trials, and that LEP was a substantially different formulation than that which had undergone prior Phase I testing, necessitating not only another reformulation in an effort to fix it, but also renewed Phase I trials of any reformulated material.

(g)     Because the current formulation of LEP was not efficacious in reducing the size of tumors or halting their growth, NeoPharm would need to scrap the current formulation and attempt to reformulate LEP in an effort to have it perform properly.

(h)     As with any new formulation of a potential new drug of which clinical efficacy is highly uncertain, the reformulated LEP would be required to undergo new Phase I dose escalation studies.

(i)     NeoPharm would need to reinitiate Phase I clinical trials for any reformulated LEP, such that the current development status of LEP had returned to the earliest stage of clinical development and the prior proof of concept that LEP could pass Phase I trials was no longer applicable.

37.     While in possession of the above publicly undisclosed inside information, defendant Hussey took advantage of his insider position and knowledge of nonpublic information by selling shares of NeoPharm at artificially inflated prices. Defendant Hussey improperly exercised options at $4.75 per share on November 13, 2001, and sold 71,000 shares at prices between $14.25 and $14.84 per share on November 13 and 14, 2001, for proceeds of approximately $1,033,000. Significantly, in the three years preceding this sale defendant Hussey had never before sold NeoPharm stock.

## PARTIAL DISCLOSURE CONTINUED TO CONCEAL MATERIAL
## INFORMATION ARTIFICIALLY INFLATING THE STOCK PRICE

38.     On January 11, 2002, investors were given their first inkling that there might potentially be a delay in Phase III clinical trials of LEP, but defendants continued to conceal from investors the serious nature and extent of the problems surrounding LEP, which were known to them internally, but not to the investing public. On January 11, 2002, after discussions with NeoPharm's senior management, stock analyst Gitkin of UBS Warburg issued an analyst report downgrading NeoPharm's stock from a buy to hold, explaining:

*       We are downgrading [NeoPharm] to a Hold from a Buy based on increasing concern regarding the timeline for Phase III development for the company's lead product LEP.

                          *     *     *

*       Recall that the Phase III program was expected to commence in 4Q01. We believe that the perceived delay in initiating a Phase III trial introduces some degree of uncertainty as to Pharmacia's ability to move forward with the product rapidly. Discussion with senior management did not serve to allay these concerns.

*       As a result, we believe that a Hold rating is most appropriate to reflect our increased concern. At present we prefer to take a wait and see approach until we gain further clarity into Pharmacia's development plans for the LEP. While we continue to believe that this product has a good likelihood of reaching the market, we are concerned that a delay in its time to market could adversely impact its market potential.

39.     Two business days later, on January 15, 2002, defendants caused NeoPharm to issue through *Business Wire* a materially false and misleading press release that concealed both the serious nature of the problems they were having with LEP and their deteriorating relationship with Pharmacia, while downplaying any potential delays in LEP Phase III trials:

NeoPharm, Inc. announced today that it met with senior officials of Pharmacia on Monday, January 14, 2002 regarding the LEP (Liposomal Encapsulated Paclitaxel) development program. Following that meeting, Pharmacia officials expressed the following points to NeoPharm officials regarding the licensing agreement with NeoPharm:

1)      Pharmacia remains fully committed to the development of LEP.
2)      Pharmacia is interested in exploring the possibility of licensing other products in the NeoPharm portfolio.

Pharmacia, under a licensing agreement with NeoPharm, currently has all responsibility for development of LEP. As a result, NeoPharm is unable to confirm the clinical development timetable for LEP at this time.

40.     On February 11, 2002, defendant Hussey spoke at the Wall Street Analyst Forum 43rd Institutional Investor Conference in New York City at the Roosevelt Hotel, where he again represented that LEP had shown successful results during clinical trials, including a lack of toxicity in test subjects:

> We have two technology platforms. One is the NeoLipid delivery system. Uh NeoLipid, are liposomes that really allows us to encapsulate a broad range of compounds. There is a lot of safety and efficacy advantages especially for drugs uh that are biologic drugs or drugs that are uh, uh very difficult to solublize are very lipid soluble. Uh, our system is very easy to manufacture, handle and store.... Let's talk a little bit about LEP, it's got a number of advantages over Taxol. It's easier to reconstitute. You get better uptake in retention in tumors. Uh, cardiolipin does inhibit multi-drug resistance, especially the P-glycoprotein pump. You get the potential for better dosing and efficacy. This is some of the Phase I/II data. You can see these were stage 4 patients all had been prior treated. Uh about 20% had greater than 35% tumor response. More importantly, there were no chronic dose limiting toxicity, there were no neuropathies, no hair loss uh at 175 dose and very little nausea, vomiting without treating them at all with medication.

During this analyst conference, defendant Hussey also downplayed and concealed the true nature of the still-publicly-undisclosed problems delaying the start of LEP Phase III clinical trials, noting only that it could take 60 days to fix a change that Pharmacia had made in LEP and that NeoPharm was working on this issue.

41.     The public statements in ¶¶38-40 above were materially false and misleading at the time they were made because they failed to disclose the true conditions regarding both the status of LEP development and the on-going dispute with Pharmacia over who was responsible for the failure of the LEP development project, including with respect to at least the following matters:

(a)     Defendants were concealing that the Phase II testing of LEP had been a failure and had shown no medical benefits, thereby indicating that the then-current formulation of LEP was not a successful or useful product that could or would be brought to market.

(b)     Modifications made to LEP were such that new Phase I trials were necessary, thereby not only delaying the start of Phase III clinical trials but setting the entire project back to square one with the additional and substantial risk and uncertainty that LEP would never be reformulated in a way that would pass Phase I trial, much less be able to proceed to Phase III trials.

(c)     Before LEP could even begin the necessary new Phase I trials it needed to be substantially reformulated for it to have any chance of being a successful medical compound, such

that the then-current LEP was at least two generations removed from the LEP that had shown success in the prior Phase I trials, and defendants were essentially back to the drawing board in an effort to create an LEP product that could successfully complete even a Phase I trial.

> (d)      NeoPharm's relationship with Pharmacia had deteriorated so that NeoPharm was evaluating whether to take legal action against Pharmacia in connection with their licensing agreement for the development of LEP.

> (e)      NeoPharm was in the process of taking LEP back from Pharmacia in an effort to reformulate the compound in a way that might make it efficacious, and therefore, contrary to their public statements, defendants did control the timeline for LEP development.

42.      On March 18, 2002, NeoPharm issued another press release reiterating that LEP was currently in development at Pharmacia, and that good results from Phase I testing of LEP were recently presented at an oncology meeting in Florida.

43.      Also on March 18, 2002, defendants held an analysts teleconference where NeoPharm representatives reported to investors that they were working with Pharmacia to expand the number and type of drugs that Pharmacia was licensed to develop for NeoPharm:

> [THE CALLER]: Hi, could you give us some clarity on the timing of the expansion of the Pharmacia agreement that you just mentioned?

> JAMES HUSSEY: [I]t's is a bit hard. Only in the sense that there are, obviously documents and discussions going back and forth. There is obviously I think urgency on both parties' part, at least from their statements, and certainly we would like to wrap up something as soon as possible. Unfortunately, sometimes to do a good deal takes longer than doing a poor deal. It's just we're unable to provide any clarity on the timing .... I don't believe it'll be years .... I don't think it'll be multiple quarters away. But I do believe it's going to – it's just unclear at this point exactly what the timing is going to be. We don't, again, foresee it to be a long, long process. But at this point, it's just hard to say when it might be resolved.

> *      *      *

> [THE CALLER]: OK. And aside from another possible agreement with Pharmacia, do you have any update on the LEP, LED timeline?

> [COMPANY REPRESENTATIVE]: [P]robably within the construct of that expanded agreement [with Pharmacia]. We'd also then be probably ready to discuss the exact timing of the updated LEP/LED submissions or in terms of clinical program and submissions.

44.     The foregoing statements in ¶¶42-43 above were false and misleading when made. At the time defendants made their public representations they knowingly, or recklessly, failed to disclose adverse material information which made their representations false and misleading. Defendants failed to disclose among other things that the ongoing LEP clinical trials were showing no success, that Pharmacia had changed the formulation of LEP in a manner not acceptable to NeoPharm, that Phase I trials were inapplicable to the current LEP formulation, and that NeoPharm was considering pursuing legal action against Pharmacia over who was responsible for the failed LEP clinical trials; accordingly it was not simply a matter of timing that stood in the way of additional licensing agreements with Pharmacia nor was it just a matter of timing that was precluding the start of Phase III clinical trials of LEP.

45.     On March 21, 2002, UBS Warburg issued an analyst report, based upon information provided by defendants, reflecting that the market was cautiously optimistic about the status of the LEP clinical trials based upon both what the Company was saying, as well as upon what it was not saying:

  *     Although there was no new news in regards to the timing of Phase III trials for LEP, the company's lead product that is being developed by Pharmacia, we continue [sic] expect to gain further clarity on this issue by mid-2002. Such clarity could be a potential catalyst for the stock as it would provide insight as to when the product could be commercialized.

46.     In an attempt to deflect attention from its undisclosed LEP problems, during the period between February 2002 and April 15, 2002, defendants caused NeoPharm to issue a number of press releases which related to potential NeoPharm products other than LEP.

47.     On April 11, 2002, NeoPharm filed its Form 10-K for the year ended December 31, 2001 with the SEC, which was signed by defendants Kapoor and Hussey on April 10, 2002, and which contained materially false and misleading statements regarding the purported success of clinical testing of LEP:

  Based on preclinical studies, we believe another potential advantage of LEP may be the ability of cardiolipin to overcome multi-drug resistance. As a result, we may be able to significantly increase the effectiveness of LEP against tumors, thereby maximizing the killing of otherwise resistant cells.

  Development Status. LEP is being developed for various solid tumors. We believe LEP is the first, and only, liposomal form of paclitaxel to enter clinical trials.

- 16 -

> Enrollment of patients in our Phase I/II clinical trials for LEP was completed in APRIL 2000 by our licensee, Pharmacia. These Phase I/II trials involved the treatment of 31 cancer patients, none of whom were then responding to other forms of treatment. Phase I/II trials have provided evidence that LEP may be able to be administered, with fewer side effects. Although not designed to measure efficacy, six patients in the Phase I/II trials experienced tumor reductions greater than 35%. The tumors in twelve other patients did not increase in size after 12 weeks, and in four of these twelve patients, the tumors were still stable in size one year later.

48.     The above public statements set forth in ¶¶45 and 47 were false and misleading because defendants knew that in its current state of development LEP had shown no benefits to patients and that the reported results of prior preclinical trials had no applicability to LEP, which had been substantially reformulated so that it was necessary to not only correct and fix the current LEP formulation, but also to conduct again the early clinical trials in an effort to show that this substantially changed new generation of LEP could pass the earliest stages of clinical trials and review.

### THE TRUTH EMERGES AT THE END OF THE CLASS PERIOD

49.     Finally, defendants shocked investors when late in the afternoon on Friday, April 19, 2002, they caused NeoPharm to issue a press release acknowledging for the first time the serious nature of the problems the Company was having with clinical trials of LEP, with the development of LEP and with Pharmacia's conduct in connection with LEP, such that NeoPharm was pursuing legal action against Pharmacia over these issues. Moreover, defendants also admitted that they had been aware of these problems for months:

> "We have patiently worked to achieve a fair and equitable resolution of our dispute with Pharmacia," said James Hussey, President and Chief Executive Officer of NeoPharm. "However, the management and Board of Directors believe that filing for arbitration at this time is the best way to protect the interests of our shareholders. We have engaged in serious discussions with Pharmacia over the last few months both about our concerns over Pharmacia's work on LEP and LED, as well as about Pharmacia's desire to expand the collaboration to include development of additional NeoPharm compounds. However, we have determined that it is not in our best interests to move forward with Pharmacia [on other programs] at least not until our concerns with Pharmacia regarding LEP and LED are successfully resolved....

> Prior to commencement of the arbitration by NeoPharm, but after NeoPharm presented its claim of breach to Pharmacia, Pharmacia presented claims of breach against NeoPharm generally concerning the nature of NeoPharm's initial disclosures to Pharmacia. NeoPharm believes that these claims against NeoPharm are without merit, and were asserted only in reaction to NeoPharm's claims of breach.

- 17 -

50. On the following Monday, April 22, 2002, defendants held an analysts teleconference where they responded to questions regarding their prior Friday's surprise announcement that NeoPharm was arbitrating its dispute with Pharmacia over LEP development. During this teleconference, defendants acknowledged that LEP was defective, that it needed to be reformulated and that at least three months earlier NeoPharm had taken LEP back into its own laboratory in an effort to reformulate it:

> And, finally, we're seeking damages because we had to divert some of our own resources away from developing other products in our pipeline, some pre-clinical products, to fix, in effect, LEP and LED, which, by the way, we're actively doing, and in the process of that right now.
>
> *   *   *
>
> [THE CALLER]: ...My last question is, then, you made mention on the call about needing to fix LEP, and can you talk a little bit about ... what actions you had to take to fix the product?
>
> JIM HUSSEY: We've been working on this for a couple of months. We are applying the neolipid technology to it, which is , as you know, our small liposomes, less than 200 nanometers, ready-to-use formulation with exceptionally good PK, especially for anti-tumor compounds. That was a project we really initiated around the first of February. Our typical timeframe for optimizing those, Jessica, is about three or four months. So that's in the process right now.
>
> Dr. Ahmad, who's actually in the room with me right now, is our Chief Scientific Officer, feels fairly confident ... we'll be able to do that. The question will remain, I think, from a timing standpoint.

During this analysts teleconference defendant Hussey also admitted that the months-long efforts to reformulated and fix LEP would also necessitate renewed preclinical trials of any new LEP compound:

> JIM HUSSEY: And insofar as the second question you had is in terms of the work on the product, we're in control of the pre-clinical work with LEP and LED right now because we're applying our technology, and that's going very quickly.
>
> [THE CALLER]: ... I guess in terms of ... moving to a Phase III ultimately on LEP or LED, what type of Phase II work do you think you're going to have to sort of re-do to get there?
>
> JIM HUSSEY: I think we'll probably do a bridging study ... in effect with the new formulation. And then, probably be in a position to move into pivotals right after that. Jeff Sherman, our Chief Medical Officer, is shaking his head yes. We know the compounds and we know it works. I mean, it's Taxol. The question is just making sure that the formulation – making sure you do all the appropriate testing.

51.    Pharmacia also acknowledged after the Class Period that LEP was not working properly during the Class Period, when Paul Fitzhenry, a spokesman for Pharmacia, stated in a *Bloomberg.com* article that "to date the formulation [of LEP] has not demonstrated any clinical benefits in studies conducted by Pharmacia."

52.    The market response to these devastating announcements was swift and decisive. NeoPharm's stock price dropped from $20.41 per share on Friday, April 19, 2002 to $15.43 on the next working day, Monday, April 22, 2002 on volume of 2,863,900 – over 17 times the prior day's volume.

53.    On April 23, 2002, defendants caused NeoPharm to issue another press release responding to Pharmacia's public disclosures, which further confirmed that, contrary to defendants' prior public statements during the Class Period, Phase II clinical trials of LEP were not successful and that LEP's failure to properly perform was the topic of months-long discussions with Pharmacia. In addition, this press release acknowledged that as currently formulated, the defective LEP was substantially different from the LEP that had been licensed to Pharmacia, such that it was in need of a significant reformulation, thereby effectively admitting that for months defendants had been returning to the drawing board with respect to the development of LEP:

> NeoPharm has become aware of comments made in the press by Pharmacia Corporation concerning NeoPharm's LEP product, which is currently the subject of a dispute in arbitration between the companies.
>
> Specifically, Paul Fitzhenry, a spokesman for Pharmacia, is quoted in a Bloomberg.com article as saying "LEP failed to show a benefit in studies Pharmacia conducted."
>
> NeoPharm wishes to clarify that the LEP formulation used by Pharmacia in Phase II clinical trials is not the LEP formulation used by NeoPharm in its own Phase I clinical trials, nor is it the LEP formulation NeoPharm licensed to Pharmacia under the 1999 License Agreement between the parties. NeoPharm contends that Pharmacia's modification of the LEP formulation, which was not approved by NeoPharm, is the reason for the product's suboptimal performance and is one of the central issues that NeoPharm plans to present upon arbitration of this dispute.

54.    On May 10, 2002, Fulcrum Global Partners issued an analyst report reiterating that "Pharmacia now claims that data from Phase II studies no longer show signs of efficacy and this is the reason for delaying the start of Phase III trials with the [LEP and LED] compounds." A July 15, 2002 First Albany Corp. analyst report summed up the situation as follows: "LEP, once the

most advanced 'enhanced' version of the cancer drug paclitaxel, has been stalled short of pivotal clinical trials for over 18 months. NeoPharm asserts that a botched reformulation by Pharmacia is the cause of the delay."

55.     During a May 9, 2002 teleconference call with analysts, defendant Hussey again acknowledged that NeoPharm was doing "most of the work" involved with creating "a new and improved formulation" of LEP. In May 2002 an abstract to an ASCO meeting further highlighted the fact that a "new formulation" of LEP had to be created and that this new formulation was in the process of "undergoing further testing in standard Phase I dose escalation." Thus, as of May 2002, NeoPharm was essentially back to the beginning with LEP, which was now having to undergo renewed Phase I testing.

56.     During the Class Period, defendants were well aware that reformulated LEP *required* renewed Phase I testing of that product because FDA requirements mandated that any new drug (or drug that had been significantly reformulated) was required to be properly tested in Phase I clinical trials. Yet defendants concealed these adverse facts from investors by failing to disclose that the current LEP was not working, that LEP would need to be reformulated in order for it to have any prospect of working, and that this new reformulation of LEP would need to undergo all necessary stages of FDA mandated clinical trials in order to demonstrate efficacy and before production could even be contemplated.

57.     As the above admissions in ¶¶49, 50, 53 and 55 demonstrate, defendants were well aware that their Class Period public statements were materially false and misleading at the time they were made, because among other things they concealed and failed to disclose that the LEP development program had suffered devastating setbacks, including: (1) that LEP had been substantially reformulated as a result of Pharmacia's development work so that it was no longer the same compound that had been licensed to Pharmacia or the same compound that had passed earlier Phase I clinical trials; (2) that clinical testing of the current LEP formulation showed no medical benefits; (3) that LEP would need further development and reformulation if it was ever to work properly; and (4) that any newly reformulated LEP would require additional Phase I testing, thereby essentially returning the entire LEP development project back to square one.

58.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; they knew that such statements or documents would be issued or disseminated to the investing public; and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. Defendants also received periodic quarterly reports from Pharmacia which revealed to them that the LEP development was not going well and that LEP was failing the Phase II clinical trials. By virtue of defendants' receipt of information reflecting the true facts regarding NeoPharm and its LEP product, their control over, receipt of, and/or modification of NeoPharm's materially misleading public statements and their associations with the Company which made them privy to confidential proprietary information concerning NeoPharm, defendants participated in the fraudulent scheme which served as a manipulative device to artificially inflate the price of NeoPharm's stock during the Class Period.

59.     During the Class Period, each of the Individual Defendants, who were senior executives and/or directors of NeoPharm, were privy to confidential and proprietary information concerning NeoPharm and its LEP development project.

60.     The market for NeoPharm securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, NeoPharm common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired NeoPharm securities relying upon the integrity of the market price of NeoPharm securities and market information relating to NeoPharm, and have been damaged thereby.

61.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of NeoPharm common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its LEP business and operations, as alleged herein.

- 21 -

62.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about NeoPharm's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of NeoPharm and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## FURTHER ALLEGATIONS REGARDING DEFENDANTS' PARTICIPATION

63.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

64.     Each of the Individual Defendants was provided with copies of NeoPharm's management reports and press releases alleged herein to be misleading prior to, or shortly after their issuance. All of the Individual Defendants had the ability and opportunity to prevent their issuance or cause them to be corrected. As a result, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein as "group published" information and are therefore responsible and liable for the representations contained therein.

65.     During the Class Period, defendants directly and indirectly engaged and participated in a continuous course of conduct to misrepresent the results of NeoPharm's operations and to conceal adverse material information regarding LEP and NeoPharm's relationship with Pharmacia as

specified herein. Defendants employed devices, schemes and artifices to defraud, and engaged in acts, practices and a course of conduct as herein alleged in an effort to increase and maintain an artificially high market price for the securities of the Company. This included the formulation, making, and/or participation in the making of untrue statements of material facts, and the omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which operated as a fraud and deceit upon plaintiff and the other members of the Class.

66. The defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein; defendants had a duty promptly to disseminate accurate and truthful information with respect to NeoPharm's products, operations and future business prospects or to cause and direct that such information be disseminated so that the market price of NeoPharm stock would be based on truthful and accurate information.

67. As officers, directors and/or controlling persons of a publicly held company whose securities are registered with the SEC under the Exchange Act, traded on the Nasdaq National Market System, and governed by the provisions of the Exchange Act, defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, products and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect the present and future financial operating results of NeoPharm, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

68. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of NeoPharm between October 31, 2001 and April 19, 2002, both dates inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

- 23 -

69. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NeoPharm common shares were actively traded on the Nasdaq National Market System. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NeoPharm or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of March i, 2002, the Company had 16,252,529 shares outstanding.

70. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

71. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

72. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) Whether defendants participated in and pursued the common course of conduct complained of herein;

(c) Whether documents filed with the SEC and other documents, press releases and statements disseminated to the investing public and NeoPharm's shareholders during the Class Period misrepresented material facts about the benefits of LEP;

(d) Whether the market price of NeoPharm common stock during the Class Period was artificially inflated due to the material misrepresentations and failure to correct the material misrepresentations complained of herein; and

(e)     To what extent the members of the Class have sustained damages and the proper measure of damages.

73.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FRAUD-ON-THE-MARKET DOCTRINE

74.     At all relevant times, the market for NeoPharm securities was an efficient market for the following reasons, among others:

(a)     NeoPharm stock met the requirements for listing, and was listed and actively traded on the Nasdaq National Market System, a highly efficient and automated market;

(b)     As a regulated issuer, NeoPharm filed periodic public reports with the SEC and the NASD;

(c)     NeoPharm regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     NeoPharm was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

75.     As a result of the foregoing, the market for NeoPharm securities promptly digested current information regarding NeoPharm from all publicly available sources and reflected such information in NeoPharm's stock price. Under these circumstances, all purchasers of NeoPharm securities during the Class Period suffered similar injury through their purchase of NeoPharm securities at artificially inflated prices and a presumption of reliance applies.

## FIRST CLAIM FOR RELIEF

### (Against All Defendants Under §10(b) of the Exchange Act and SEC Rule 10b-5)

76.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     This claim is asserted against all defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

78.     During the Class Period, defendants, singularly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business, which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase NeoPharm common stock during the Class Period at artificially inflated prices.

79.     During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of, the deceptive and materially false and misleading statements to the investing public as particularized above.

80.     Throughout the Class Period, NeoPharm acted through the Individual Defendants, whom it portrayed and represented to the financial press and public as its valid representatives. The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to NeoPharm, which is primarily liable for the securities law violations of the Individual Defendants while acting in their official capacities as Company representatives, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of respondent superior.

81.     As a result of the dissemination of the false and misleading statements set forth above, the market price of NeoPharm common stock was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and

manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing NeoPharm common stock. Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

82.     Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

83.     By reason of the foregoing, defendants directly violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with their purchases of NeoPharm common stock during the Class Period.

## SECOND CLAIM FOR RELIEF

### (Against the Individual Defendants Under §20(a) of the Exchange Act)

84.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.     The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of §20(a) of the Exchange Act.

86.     The Individual Defendants had the power and influence and exercised the same to cause NeoPharm to engage in the illegal conduct and practices complained of herein.

87.     By reason of the conduct alleged in the Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct, and are liable to plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of NeoPharm common stock during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

D.     Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: September 16, 2002          LASKY & RIFKIND, LTD.
                                   NORMAN RIFKIND (6191038)


                                   NORMAN RIFKIND

                                   11 South LaSalle Street, Suite 1600
                                   Chicago, IL 60603
                                   Telephone: 312/634-0057

                                   Liaison Counsel

                                   MILBERG WEISS BERSHAD
                                    HYNES & LERACH LLP
                                   WILLIAM S. LERACH
                                   HELEN J. HODGES
                                   STEVEN W. PEPICH
                                   DAVID A. THORPE
                                   401 B Street, Suite 1700
                                   San Diego, CA 92101
                                   Telephone: 619/231-1058

                                   Lead Counsel for Plaintiffs

N:\CASES\NeoPharm\DCC81231.cpt

- 28 -

## CERTIFICATE OF SERVICE

The undersigned, an attorney herein, does hereby certify that he caused a copy of the Consolidated Amended Class Action Complaint for Violations for Federal Securities Law to be served via United States mail on this 16th day of September, 2002 on the following:

**See attached service list**

NORMAN RIFKIND

Marc A. Topaz
Schiffrin & Barroway, LLP
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004

Paul J. Geller
Howard K. Coates, Jr.
Jack Reise
Cauley, Geller, Bowman & Coates, LLP
2255 Glades Road, Suite 421A
Boca Raton, FL 33431

Joel P. Latiman
Jay P. Saltzman
SCHOENGOLD & SPORN, P .C.
19 Fulton Street, Suite 406
New York, NY 10038

David H. Kistenbroker
Leah J. Domitrovic
Katten Muchin Zavis & Rosenman
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067-6042

Joshua M. Lifshitz
Peter D. Bull
Bull & Lifshitz LLP
18 East 41st Street
New York, NY 10017

Marvin A. Miller
Jennifer Winter Sprengel
Christopher B. Sanchez
Miller Faucher and Cafferty LLP
30 N. LaSalle Street, Suite 3200
Chicago, IL L60602

Marvin L. Frank
Rabin & Peckel, LLP
275 Madison Avenue
New York, NY 10016

Leann Pedersen Pope
Stephen Ryan Meinertzhagen
Burke, Warren, Mackay & Serritella, P.C.
IBM Plaza, 330 North Wabash Avenue
Chicago, IL 60611

Lucy H. Koh
Lloyd Winawer
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050