**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| **In re NEOPHARM, INC. SECURITIES** ) | **02 C 2976** |
| **LITIGATION** ) | **Judge Joan H. Lefkow** |
| ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

The lead plaintiff in this class action lawsuit, Operating Engineers Construction Industry and Miscellaneous Pension Fund (Local 66 - Pittsburgh) ("plaintiffs"), is suing NeoPharm, Inc. ("NeoPharm") and two individual defendants for securities fraud (collectively, "defendants" or "NeoPharm"), specifically, for violation of Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78(j), and Rule 10(b)-5 promulgated thereunder, codified at 17 C.F.R. § 240.10b-5. Plaintiffs have also sued the individual defendants as alleged "control persons" for violation of Section 20(a) of the 1934 Act, codified at 15 U.S.C. § 78(t).

Currently before the court is plaintiffs' motion for "Summary Adjudication of Issues Based on Collateral Estoppel." Dkt No. 106 (Jan. 26, 2005). Invoking Rule 56, plaintiffs ask the court to preclude NeoPharm from relitigating various "factual issues" that they contend were resolved in an arbitration between NeoPharm and a third party, Pharmacia & Upjohn Company ("Pharmacia"). Plaintiffs have also moved for leave to amend their complaint. Dkt. No. 106 (Jan. 26, 2005). They seek to add Dr. John Kapoor, who was dismissed from this case without prejudice in this court's order of February 7, 2003, Dkt. No. 45, as an individual defendant, and to reallege that certain statements that the company made before the class period, which were dismissed with prejudice in that same order of February 7, 2003, were false or misleading at the

time that they were made.  Finally, plaintiffs want to add allegations based on the factual findings from the arbitration decision as well as information from NeoPharm's internal documents produced in discovery.  For the following reasons, plaintiffs' motions are denied.

I.      Background

NeoPharm is a publicly owned biopharmaceutical company that researches and develops experimental drugs for the treatment of cancer.  NeoPharm's Response to Plaintiffs' Motion for Summary Adjudication of Issues Based on Collateral Estoppel, Dkt. No 119 (March 9, 2005) ("NeoPharm's Response"), at 2.  Liposome Encapsulated Paclitaxel ("LEP") is one of its star prospects.  NeoPharm's Response, at 2; http://www.neopharm.com (last visited Feb. 15, 2007).  NeoPharm licensed the rights to develop and market LEP to Pharmacia pursuant to an agreement reached in February of 1999 (the "License Agreement").  NeoPharm's Statement of Add'l Facts ("NeoPharm's Statement"), at ¶ 13.  Pharmacia was obligated under the License Agreement to use "reasonable efforts" to bring LEP to market.  NeoPharm's Statement, at ¶ 14.  During the class period (between October 31, 2001 and April 19, 2002), NeoPharm made various statements to the public in which it discussed the potential benefits of LEP and some positive results from early testing.  Plaintiffs' complaint alleges that these statements were false or misleading because NeoPharm concealed serious problems in the LEP development process.

On April 19, 2002, NeoPharm announced that it had concerns over Pharmacia's work on LEP, and that it had commenced arbitration against Pharmacia for breach of the License Agreement.  NeoPharm's Answer to Plaintiff's Consolidated Amended Class Action Complaint ("NeoPharm's Answer"), at ¶ 49; NeoPharm's Statement, at ¶ 40; Lead Plaintiff's Motion for

Summary Adjudication of Issues Based on Collateral Estoppel, Dkt. No. 106 ("Plaintiffs' Motion"), Ex. 2, at 1 (arbitration decision). After this announcement, the price of NeoPharm's stock dropped significantly. Plaintiffs filed their complaint on April 25, 2002. Complaint, Dkt. No. 1 (April 25, 2002).

In the arbitration, NeoPharm alleged, *inter alia*, that Pharmacia did not use reasonable efforts to develop LEP and that it misrepresented and concealed facts from NeoPharm concerning the status of the development. Plaintiffs' Motion, Ex. 2, at 2. For example, NeoPharm alleged that Pharmacia unreasonably abandoned NeoPharm's formulation of LEP ("LEP-s") in favor of a reformulation ("LEP-ns"), entered Phase II trials with LEP-ns instead of LEP-s, used the "maximum tolerated dose" determined in Phase I trials for LEP-s on LEP-ns, and ran the LEP-ns Phase II trial at the same time as the LEP-ns Phase I trial. *Id*. at 20-21; *cf.* Defendants' Response, at 6 n.4.[1] Pharmacia counter-claimed for rescission, arguing that NeoPharm induced it to enter into the Agreement by misrepresenting and concealing material facts about LEP. *Id*. at 2.

After a lengthy proceeding involving 46 days of sworn testimony and hundreds of exhibits, the arbitrators denied both parties' claims in a 34-page decision. The alleged "facts" that plaintiffs seek to preclude defendants from relitigating and the additional allegations that they seek leave to add to their complaint are taken from that decision. *Id*. at 33; Plaintiffs' Statement of Material Facts in Support of Motion ("Plaintiffs' Statement"), at ¶¶ 6-9.

---

[1] Defendants characterize the arguments that they made in the arbitration somewhat differently, but the distinctions are immaterial for purposes of this case.

II.    Motion for Summary Adjudication of Issues Based on Collateral Estoppel

    A.    Summary Judgment Standards

    Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c).  The party seeking summary judgment bears the initial burden of proving that there is no

genuine issue of material fact.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548,

2553, 91 L. Ed. 2d 265 (1986).  In plaintiffs' motion for summary adjudication of issues based on

collateral estoppel, they are not asking the court for judgment on their securities fraud claims.

Instead, they are requesting that the court enter an order precluding defendants from contesting or

relitigating factual issues that they argue were resolved in the context of NeoPharm's arbitration

with Pharmacia.  Plaintiff's Memorandum in Support of its Motion, at 1.

    Rule 56 does not provide a mechanism for a court to enter summary judgment on facts

that are not dispositive of an entire claim, count, or affirmative defense.[2]  Fed. R. Civ. P. 56;

*Petroff Trucking Co., Inc.* v. *Envirocon, Inc.*, 2006 WL 2938666, at *3 (S.D. Ill. Oct. 13, 2006);

*Rubin* v. *Islamic Republic of Iran*, 408 F. Supp. 2d 549, 552 (N.D. Ill. 2005) (citations omitted)

("A motion for partial summary judgment that partitions a single claim for relief into constituent

parts and then seeks partial summary judgment on some but not all of the constituent parts is not

---

[2] Plaintiffs argue that issue preclusion, as opposed to claim preclusion, is available to resolve individual factual issues that amount to less than a whole claim.  The real question here, however, is not a comparison of issue and claim preclusion; it is whether *summary judgment* can be granted on parts of a claim that are not dispositive of the whole.  The only case that plaintiffs cite on this point does not support their request for an order of collateral estoppel here; in *Axa Corp. Solutions* v. *Underwriters Reins. Co.*, 2004 U.S. Dist. Lexis 22609 (N.D. Ill. Nov. 9, 2004) (Lefkow, J.), this court considered motions for summary judgment that were properly brought on entire claims and used collateral estoppel to establish certain elements within those claims.

permitted."); *O'Phelan* v. *Fed. Express Corp.*, 2005 WL 2387647, at *8 (N.D. Ill. Sept. 27, 2005); *Ting* v. *Chicago Mercantile Exchange, Inc.,* 2005 WL 2335584, at *7 (N.D. Ill. Sept. 21, 2005); *Allen* v. *Chicago Transit Authority*, 2000 WL 1139898, at *3 (N.D. Ill. Aug. 10, 2000); *Softa Group, Inc.* v. *Taylor*, No. 92 C 2420, 1992 U.S. Dist. Lexis 8713, at *1-*2 (N.D. Ill. June 24, 1993) (Lefkow, Exec. Mag. J.); *Quintana* v. *Byrd*, 669 F. Supp. 849, 850 (N.D. Ill. 1987) (Ann C. Williams, J.); *Arado* v. *General Fire Extinguisher Corp.*, 626 F. Supp. 506, 508-09 (N.D. Ill. 1985); *Capital Records, Inc.* v. *Progress Record Distributing, Inc.*, 106 F.R.D. 25, 28-29 (N.D. Ill. 1985). This principle is grounded in the need to conserve judicial resources. If parties could bring piecemeal motions for summary judgment, the courts would be overwhelmed with constant requests to resolve factual issues. *Capitol Records*, 106 F.R.D. at 29. "Such adjudications would not dispose of a claim or even become final until trial, and would waste judicial resources in almost every case." *Id*.

Federal Rule of Civil Procedure 56(d) also does not typically provide a vehicle for the relief that plaintiffs seek. It provides the following:

> **Case Not Fully Adjudicated Upon Motion**. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Fed. R. Civ. P. 56(d). This provision is usually understood to come into play only after a proper motion for summary judgment under Rule 56(a) or (c) as to an entire count or claim is denied on

its merits, with a purpose of salvaging some of the judicial resources that are expended in considering such a motion. *Lovejoy Elec., Inc.* v. *O'Berto*, 616 F. Supp. 1464, 1473 (N.D. Ill. 1985); *Rubin*, 408 F. Supp. 2d at 552; *Capitol Records*, 106 F.R.D. at 29-30 ("A fair reading of Rule 56(d) ... is that it does not allow a party to bring a motion for a mere factual adjudication. Rather, it allows a court, on a proper motion for summary judgment, to frame and narrow the triable issues if the court finds that such an order would be helpful to the progress of the litigation."); *Mendenhall* v. *Barber-Greene Co.*, 531 F. Supp. 947, 948 (N.D. Ill. 1981).

Some judges in this circuit have taken the position that in certain situations, Rule 56(d) may be independently invoked to request an interlocutory order finding certain facts to be conclusively established for the remainder of a case. *Zapata Hermanos Sucesores, S.A.* v. *Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir. 2003); *Northeast Ill. Regional Commuter RR Corp.* v. *Kiewit Western Co.*, 396 F. Supp. 2d 913, 921 (N.D. Ill. 2005); *In re Doctors Hospital of Hyde Park*, 330 B.R. 689, 698 (N.D. Ill. 2005). In each of these cases, however, the courts explained that the merits of the parties' motions could be considered and ruled on because doing so would promote judicial economy. *Zapata*, 313 F.3d at 391; *Kiewit Western Co.*, 396 F. Supp. at 922; *Doctors Hospital of Hyde Park*, 330 B.R. at 698.

Similarly, in *Oberweis Dairy, Inc.* v. *Assoc. Milk Producers, Inc.*, 553 F. Supp. 962, 965 (N.D. Ill. 1982), the court received a motion for summary judgment seeking to use collateral estoppel to preclude the other party from relitigating certain specific facts and issues from a prior action, even though those issues did not resolve an entire claim. Although the court held that Rule 56 was the wrong procedural vehicle to use, it interpreted the request as one under Rule 16 and considered it on the merits. *Id.* Significantly, the previously litigated claims and the claims

at issue were both for violations of the antitrust laws. *Id*. at 964-65. After considering whether offensive collateral estopped was appropriate, the court found that the previous litigation's specific findings on several of the common elements of the antitrust claims would be given preclusive effect. *Id*. at 970.

Here, the court will examine the proposed facts that plaintiffs seek to preclude defendants from relitigating and determine whether those facts establish the elements of their securities fraud claims, entitling them to summary judgment. If plaintiffs are not entitled to summary judgment, the court will go on to consider the possibility of an order under Rule 56(d) or Rule 16.

B.     Discussion

To establish liability under Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale or securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." Mem. Op. And Order, Dkt. No. 45, at 17 (February 7, 2003) (citing *Caremark, Inc.* v. *Coram HealthCare Corp.,* 113 F.3d 645, 648 (7th Cir. 1997); *Searls* v. *Glasser*, 64 F.3d 1061, 1066-67 (7th Cir. 1995)); *see also Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.,* 437 F.3d 588, 595 (7th Cir. 2006), *cert. granted*, 127 S. Ct. 853, 75 USLW 3207, 75 USLW 3340, 75 USLW 3349 (U.S. Jan 5, 2007) (NO. 06-484).

Plaintiffs ask this court to find that excerpted quotes from the arbitration decision are "facts" that are "conclusively established in this litigation and defendants are precluded from

relitigating these matters here." Plaintiffs' Proposed Order, at 1-3. Included among 16 proposed

paragraphs of "facts" are the following (citations to the arbitration award are omitted):

- The sonicated version of LEP (LEP-s) was problematic from the beginning. In May 1999, Pharmacia received 100 vials of LEP from NeoPharm so that it could begin to design a development plan and conduct pre-clinical tests on the material. In one test that was done in May 1999, 10 out of 20 rats died after being injected with LEP-s. In a second test conducted that same month, one of two dogs that were injected with LEP-s died.

- Between July and August 1999, Pharmacia conducted numerous experiments designed to test the encapsulation efficiency of LEP-s. As a result of these tests, Pharmacia determined that encapsulation efficiency for LEP-s was inconsistent from sample to sample, even for those samples reconstituted using the same procedure at the same site. Many of these tests demonstrated that free paclitaxel, in crystalline form, was present in the LEP-s samples.

- Recorded variability of the level of free paclitaxel in reconstituted formulations of LEP-s ranged from zero to 33% free paclitaxel. NeoPharm, and later Pharmacia, specified that the level of free paclitaxel in LEP-s must be no greater than 20%. In another test Pharmacia dosed three dogs with LEP-s and two of the three dogs died prematurely because the LEP-s contained 28% free paclitaxel.

Plaintiffs' Proposed Order, at 1.

These "facts" that plaintiffs ask the court to find do not establish any elements of

plaintiffs' claim for securities fraud. Although plaintiffs generally argue that the arbitration

findings prove that NeoPharm made false statements to the market, Plaintiffs' Reply, at 3, they

have not effectively linked any of the arbitration findings to any of NeoPharm's statements to

show how the facts prove that the statements were false or misleading. For example, the

following are some of the allegedly false or misleading statements:

- NeoPharm today [October 31, 2001] announced that clinical data for liposome encapsulated paclitaxel (LEP) were presented at the AACR-NCI-EORTC meeting in Miami, Florida on Tuesday. In the study, LEP is administered weekly for six weeks using an intravenous infusion.... LEP is being developed by Pharmacia Corporation under a licensing agreement with NeoPharm. "In the Pharmacia

study involving weekly dosing of LEP, an extended terminal half-life was observed," said Imran Ahmad, Chief Scientific Officer of NeoPharm. "This is a significant improvement because more paclitaxel appears to [be] available to attack tumors over the six week administration schedule."

• NeoPharm, Inc. announced today [January 15, 2002] that it met with senior officials of Pharmacia on Monday, January 14, 2002 regarding the LEP (Liposome Encapsulated Paclitaxel) development program. Following that meeting, Pharmacia officials expressed the following points to NeoPharm officials regarding the licensing agreement with NeoPharm:
  1) Pharmacia remains fully committed to the development of LEP.
  2) Pharmacia is interested in exploring the possibility of licensing other products in the NeoPharm portfolio.
Pharmacia, under a licensing agreement with NeoPharm, currently has all responsibility for development of LEP. As a result, NeoPharm is unable to confirm the clinical development timetable for LEP at this time.

Am. Compl., at ¶¶ 33, 39.

Even if the court were to accept the arbitrators' findings as facts, it would not logically follow that the allegedly fraudulent statements made by NeoPharm were false or misleading. First, in several of the statements, such as "The sonicated version of LEP (LEP-s) was problematic from the beginning," the arbitrators used subjective words whose meaning cannot be commuted from the breach of contract context to this securities fraud case. When the arbitrators said that LEP-s was "problematic," they were considering whether it was reasonable for Pharmacia to reformulate it, not whether NeoPharm could still appropriately discuss its potential with the public or whether NeoPharm's statements were fraudulent. It was not necessary in that context for the arbitrators to be precise in what they meant by "problematic," and this court cannot infuse their words with meaning that was not necessarily intended.

Second, the court is not in a position to evaluate the significance of data such as encapsulation efficiency and the presence of free paclitaxel or the implications of this

information on LEP's general potential.  For example, it is not for the court to decide that the presence of 28% free paclitaxel in a particular test would render a statement that LEP had performed well in early clinical testing fraudulent.

Third, it is true that "if NeoPharm had knowledge that the Phase II trials were failing to such a great degree that the Phase I results would be affected, and that they were, for all practical matters, back to the drawing board with respect to LEP development, then [statements regarding Phase I success may have] been misleading to investors," as the court stated in its February 7, 2003 order regarding defendants' motion to dismiss.  Dkt. No. 45, at 20.  Plaintiffs' "facts," however, do not show that LEP-ns's failures in certain Phase II trials rendered the positive Phase I results for LEP-s invalid or irrelevant to LEP's potential.  The arbitrators discussed negative results of LEP-ns in Phase II clinical trials for patients with gastric, esophogeal, and bladder cancers, but believed that testing had not yet started for LEP-ns's efficacy in treating breast and small-cell lung cancers, which were the most likely candidates for LEP's success. Plaintiffs' Motion, Ex. 2, at 15-16; Defendants' Response, at 2-3; Defendants' Statement, at ¶¶ 26, 29, 60.  Additionally, neither NeoPharm nor Pharmacia knew exactly what the differences were between LEP-s and LEP-ns, Plaintiffs' Response to Defendants' Statement, at ¶ 23, which makes it difficult for anyone, and particularly a court, to draw conclusions from the failures of LEP-ns[3] about the viability of LEP in general.

Another key element of plaintiffs' claims is missing: plaintiffs have not shown how their alleged "facts" prove that any of the defendants had the requisite scienter at the time that they

---

[3] The court notes that there is some evidence in the record that LEP-s had success in the Phase I trials conducted by Pharmacia that concluded in 2000.  Defendants' Statement, at 18-19.

made their public statements. "[W]ith respect to each act or omission alleged" as false or misleading, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). That required state of mind, or scienter, is "the intent to deceive, manipulate, or defraud," *Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185, 193, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976), or "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Tellabs*, 437 F.3d at 600 (citations omitted).

Plaintiffs do not effectively link the defendants' knowledge at any particular time to any of the defendants' public statements. Their citation to the arbitrators' conclusion that Pharmacia did not breach its contractual duty to keep NeoPharm adequately informed is insufficient, especially in light of the fact that it was a key point of contention. Plaintiffs' Motion, Ex. 2, at 2. The arbitration decision is not clear as to exactly what information Pharmacia needed to or did convey to NeoPharm, or when, in order to satisfy its contractual requirement; it did not need to make such specific findings in order to resolve the breach of contract claims. In contrast, in order to prevail on their securities fraud claims, the plaintiffs must show that each of the defendants had the requisite scienter at the time that they made each allegedly fraudulent statement. *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *7 (N.D. Ill. July 12, 2006); *In re Abbott Labs. Sec. Litig.,* 813 F. Supp. 1315, 1318-19 (N.D. Ill. 1992). Additionally, while plaintiffs ask the court to find many "facts" regarding what *Pharmacia* knew or believed about the status of LEP, Pharmacia's knowledge is irrelevant to the question of NeoPharm's

scienter unless the plaintiffs can prove that NeoPharm shared relevant and specific knowledge at the times that they made the allegedly fraudulent public statements.

Finally, the arbitration could not have determined the last two elements of plaintiffs' claim under Section 10(b): that the plaintiffs justifiably relied on NeoPharm's statements and that those statements proximately caused them damages. Plaintiffs' proposed findings therefore do not prove their securities fraud claims, or any elements of them, and the court cannot enter summary judgment on those claims.

Even assuming that the court could enter judgment on non-determinative facts, the requirements for offensive collateral estoppel have not been met. The parties are unclear as to which law applies to determine the preclusive effect of the arbitration. Seventh Circuit law and New York state law are the possibilities. These jurisdictions agree on the fundamental requirements for collateral estoppel, and any nuances between them do not affect how the doctrine applies to this case. Both jurisdictions require at least that the issue to be precluded is identical to one from the previous action and that it was necessarily decided in that action, and that the party against whom estoppel is to be applied had a full and fair opportunity to contest the earlier decision. Plaintiffs' Mem., at 9; NeoPharm's Mem., at 13; Plaintiffs' Reply, at 6.[4]

_____

[4] *See also Lumbermens Mut. Cas. Co.* v. *606 Restaurant, Inc.*, 819 N.Y.S.2d 511, 512 (N.Y. App. Div. 2006); *Lang* v. *City of Round Lake Park*, 87 F. Supp. 2d 836, 842 (N.D. Ill. 2000) (the law of the state where the judgment was rendered determines the judgment's preclusive effect); *accord La Preferida, Inc.* v. *Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905-06 (7th Cir. 1990) ( for collateral estopped to apply, 1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must [have been] fully represented in the prior action); *cf* 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Fed. Practice & Procedure §4475.1, at n.51 (2006) (some courts apply federal law to determine the collateral estoppel effect of prior arbitrations in securities fraud cases).

Ultimately, the court has discretion in determining whether to apply offensive collateral estoppel, especially based on an unconfirmed arbitration decision. *Parklane Hosiery Co.* v. *Shore,* 439 U.S. 322, 331, 99 S. Ct. 645, 651, 58 L. Ed. 2d 552 (1979); *Stulberg* v. *Intermedics Orthopedics*, 997 F. Supp. 1060, 1066 (N.D. Ill. 1998) (emphasis in original) ("courts are not **required** to afford previous unconfirmed arbitration awards preclusive effect on later federal proceedings; however, courts **may impose** such preclusion in appropriate cases."); 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Fed. Practice & Procedure § 4475.1 (2006) ("An arbitral award may be even more susceptible to concerns springing from the identity of the parties, and preclusion should be made available for the benefit of a nonparty only with real care.").

The status of LEP development was relevant to the breach of contract arbitration and is also relevant to this case, but there is no identity of necessary issues between the two. In the arbitration, the ultimate question was whether Pharmacia complied with its obligations under the license agreement to develop LEP. The arbitrators focused on the reasonableness of Pharmacia's efforts. Here, in contrast, the court must decide whether NeoPharm made fraudulent statements to the market, with scienter, about the progress of LEP development. In such distinct contexts, the decisionmakers must keep very different standards in mind and their statements are not commutable findings of fact. *See Kenny* v. *New York City Transit Authority*, 713 N.Y.S.2d 173, 174 (N.Y. App. Div. 2000); *Harper & Co., Inc.* v. *Nortek, Inc.*, 104 F.3d 913, 922 (7th Cir. 1997); *In re Bozovic*, 2004 WL 1905355 (Bankr. N.D. Ill. Aug, 24, 2004). Additionally, it is not clear that each of the "facts" that plaintiffs ask this court to find were necessary to the arbitrators' decision. The statements do not each constitute conclusions on an element of a breach of contract action, and it is likely that many of them were not essential to the decision and were

13

merely additional observations, or dicta, of the arbitrators.  For example, it is implausible that the fact that 10 out of 20 rats died in one particular experiment was dispositive for the arbitrators in their finding that Pharmacia used reasonable efforts to develop LEP.

For all of these reasons, the court declines to exercise its discretion to enter an order under Rule 56(d) or Rule 16 precluding defendants from relitigating the plaintiffs' proposed "facts."  Doing so would not further the litigation and it would waste judicial resources for the court to spend time examining the arbitrators' discourse and picking out certain sentences that could be relevant facts.[5]  As NeoPharm suggested, a better route for the plaintiffs would be to draft requests for admission of concise and discrete points that were determined in the arbitration and are relevant to this case.

III.     Motion for Leave to Amend the Consolidated Amended Complaint

Plaintiffs have also moved for leave to amend their complaint.  Dkt. No. 106.  They want to reallege that Dr. John Kapoor, who was originally named as a defendant in this case but was dismissed without prejudice in the court's February 7, 2003 order, is a controlling person of the company and is individually liable for the securities fraud.  They also want to reallege that certain pre-class period statements, dismissed with prejudice in that same order, were false at the time they were made.  Finally, plaintiffs want to include new allegations based on the factual findings from the arbitration decision and NeoPharm's internal documents produced through discovery.

---

[5] Because the court has determined that collateral estoppel will not be applied against NeoPharm, it is not necessary to determine whether it would be appropriate to apply it against the individual defendants.

The quantitative difference between the current complaint and the proposed amended complaint is approximately 20 pages: from 28 pages to 47.

A.      Standard

Federal Rule of Civil Procedure 15(a) provides, in relevant part, that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Plaintiffs cite an interpretation of "when justice so requires" from *Foman* v. *Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

Defendants' citations are generally in accord, and add that "[i]t is not an abuse of discretion to refuse a request to amend when the proffered amendment merely restates the same facts using different language, or reasserts a claim previously determined." *Wakeen* v. *Hoffman House, Inc.*, 924 F.2d 1238, 1244 (7th Cir. 1983) (citing *Kasey* v. *Molybdenum Corp. of America*, 467 F.2d 1284, 1285 (9th Cir.), *cert. denied*, 409 U.S. 1063, 93 S. Ct. 571, 34 L. Ed. 2d 516 (1972)).

B.    Discussion

1.    Kapoor

Plaintiffs' proposed amended complaint retains Dr. John Kapoor as an individual defendant, despite the fact that Kapoor was dismissed from this case on February 7, 2003. Mem. Op. And Order, at 27 n.5, 28 ("the court will dismiss the claims against Kapoor without prejudice."). Defendants object on the basis that the statute of limitations has run for claims against Kapoor. They also object to plaintiffs' undue delay in seeking the amendment and the unfair prejudice that would result from the addition of Kapoor as an individual defendant.

The parties agree that the applicable statute of limitations is "the earlier of two years after discovery of the facts constituting the violations or within five years of the violations," and that it started to run on April 19, 2002. Plaintiffs' Reply to Motion for Leave to Amend the Consolidated Amended Complaint, Dkt. No. 126 (April 12, 2005), at 7 n.7 ("Plaintiffs' Reply"); Defendants' and Non-Party John Kapoor's Response to Lead Plaintiff's Motion for Leave to Amend the Consolidated Amended Complaint, Dkt. No. 122 (March 9, 2005), at 5 ("Defendants' Response") (citing § 804 of the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658(b)). Plaintiffs served their motion to amend on defendants on November 16, 2004. This was two years and almost five months after any potential claims against Kapoor accrued. Plaintiffs argue that the limitations period had not run because Kapoor was named as a defendant in the case when it was originally filed, and his dismissal did not end his exposure to liability. Finally, plaintiffs attempt to rely on principles of relation back and equitable tolling.

The Seventh Circuit has squarely held that "a suit dismissed without prejudice is treated for statute of limitations purposes as if it had never been filed.... [W]hen a suit is dismissed

without prejudice, the statute of limitations is deemed unaffected by the filing of the suit, so that if the statute of limitations has run the dismissal is effectively with prejudice." *Elmore* v. *Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000) (citations omitted); *Muzikowski* v. *Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003) (same).[6]  Kapoor's dismissal without prejudice from this case on February 7, 2003 therefore caused the statute of limitations to run as if the case had never been filed.  When plaintiffs attempted to retain Kapoor as a defendant in the case on November 16, 2004, they were about five months too late and their claims were barred.

Alternatively, even if the statute had not run, the court would still deny plaintiffs' amendment adding Kapoor as a defendant because because plaintiffs unduly delayed in seeking the amendment and allowing the amendment would unduly prejudice Kapoor as well as the other defendants in this case.  Plaintiffs' primary explanation for why they waited until November of 2004 to file their motion to amend is that they only received a copy of the arbitration decision from defendants in September of 2004.  This cannot justify their tardiness in seeking to retain Kapoor as a defendant, however, because Kapoor was not a party to the arbitration, was not a witness, and is not even mentioned in the decision.  *See* Plaintiffs' Motion, Ex. 2.  Additionally, defendants represent that Kapoor produced 2,205 pages of documents in response to discovery requests in the summer of 2003, Defendants' Response, at 2, more than a year before plaintiffs filed this motion to amend.  Plaintiffs' statement that "[a]fter reviewing the new facts from discovery, plaintiff determined that the additional evidence warrants the retention of Kapoor as a defendant" therefore can not justify their delay.  *See* Plaintiffs' Reply, at 5 n.3.

---

[6] The court finds plaintiffs' attempts to distinguish these cases, as well as their characterization of defendants' position as "extreme" or "absolutely [without] support," to be unpersuasive.  *See* Plaintiffs' Reply, at 5-10.

Although the court is sympathetic to plaintiffs' difficulties in satisfying the strict pleading standards of the PSLRA when information necessary to do so is in the possession of defendants, in this case neither the receipt of the arbitration decision nor the need for discovery can excuse plaintiffs' delay in seeking their amendments. Plaintiffs unduly delayed in seeking amendment, which is a sufficient basis to deny a party's request for leave to amend. *Glatt* v. *Chicago Park District*, 87 F.3d 190, 194 (7th Cir. 1996); *Hindo* v. *Univ. of Health Sciences*, 65 F.3d 608, 615 (7th Cir. 1995); *Continental Bank, N.A.* v. *Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993).

Under these circumstances, granting plaintiffs' request to retain Kapoor as an individual defendant 21 months after he had been dismissed from the case would be unduly prejudicial to him and to the other defendants, as would the resulting necessity of engaging in further discovery regarding Kapoor's liability. *Talton* v. *Unisource Network Servs., Inc.*, 2004 WL 3119007, at *3 (N.D. Ill., Dec. 21, 2004); *Jones* v. *GES Exposition Servs., Inc.*, 2004 WL 2011396, at *5 (N.D. Ill. Sept. 7, 2004) ("Undue prejudice occurs when the amendment 'brings entirely new and separate claims, adds new parties, or at least entails more than an alternative claim or a change in the allegations of the complaint' and when the additional discovery is expensive and time-consuming."). Statutes of limitation serve to "minimize legal uncertainty both about the outcome of eventual litigation and about the existence and scope of the potential defendant's liability." *Elmore*, 227 F.3d at 1013 (citations omitted). As of February 7, 2003, Kapoor was dismissed, meaning that he was relieved of any possibility of personal liability. Any possibility of appeal does not mean than Kapoor is currently subject to liability in this case and does not justify the court's disregard of an applicable statute of limitations or of the negative effect on him that allowing this amendment would cause.

Plaintiffs cannot rely on equitable tolling or the relation back principle. "The running of a statute of limitations can be equitably tolled when through no fault of his own the plaintiff was unable to sue within the limitations period but he sued as soon as he could." *Elmore*, 227 F.3d at 1013 (citations omitted). This does not apply here; plaintiffs were able to sue Kapoor between February 8, 2003 and April 19, 2004. They did not, nor did they sue as soon as they could, as discussed above.

Finally, plaintiffs' amendment is not justifiable under Rule 15(c)'s provisions for relation back of amendments. Plaintiffs' argument that their claim against Kapoor relates back to the filing date of the original complaint is infirm because it cites only part of the applicable rule. Plaintiffs cite only the general relation back standard set forth in Rule 15(c)(2): that "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Because this is a case seeking to "change[] the party or the naming of the party against whom a claim is asserted," however, plaintiffs must satisfy the additional specific requirements of Rule 15(c)(3): that the party to be added "received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, *and* [] knew or should have known that, *but for a mistake concerning the identity of the proper party*, the action would have been brought against the party." Fed. R. Civ. P. 15(c)(2)-(3) (emphasis added). Plaintiffs argue, without supporting citations, that the additional requirement of a mistake in identity does not apply here. That is incorrect. Plaintiffs' claim against Kapoor does not relate back. For all of these reasons, the

court will not exercise its discretion to allow plaintiffs leave to amend their complaint to include allegations of individual liability against Kapoor.[7]

## 2. Pre-class period statements

Plaintiffs seek to reallege that statements made by NeoPharm before the beginning of the class period were materially false at the time that they were made because of their failure to disclose adverse information about LEP development, and that NeoPharm breached its duty to correct these statements. In the court's order of February 7, 2003, it dismissed claims based on these statements *with prejudice* on the basis that they were insufficiently alleged to have been false when they were made, and that therefore NeoPharm had no duty to correct them. Mem. Op. and Order, Dkt. No. 45, at 18 (citing *Stransky* v. *Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995); *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 282 (7th Cir. 1996)). Plaintiffs now argue that "the proposed amendment, which is based on the arbitration fact findings, demonstrate[s that] defendants' pre-Class Period statements regarding LEP were not true at the time they were made." Plaintiffs' Reply, at 4. The pre-class period statements in question are as follows:

(1)      We also made significant progress in both our pre-clinical and clinical programs and have begun to expand our infrastructure to support our electrostatic liposomal platform development. We plan on placing a number of compounds in our liposomal system in the coming months.

---

[7] The court expresses no opinion on whether the claims against Kapoor could survive a motion to dismiss. The possibility of eliciting further motions itself, however, is another basis for denying this motion to amend. *Talton* v. *Unisource Network Servs., Inc.*, 2004 WL 3119007, at *3 (N.D. Ill. Dec. 21, 2004).

(2)    LEP is a liposomal encapsulated formulation of the widely-used cancer drug, paclitaxel.  Paclitaxel is marketed by Bristol-Myers Squibb Company under the trade name "Taxol ®" and is used in the treatment of a number of tumors, including breast, ovarian and lung cancer.  Despite paclitaxel's wide use and its anti-tumor characteristics, its effectiveness is limited by its side effects, which can include nausea, vomiting, hair loss and nerve and muscle pain.  Because of the chemical characteristics of paclitaxel, it cannot be introduced into the body unless it is first formulated in a toxic mixture of castor oil and ethanol which requires premedication of the patient.  In addition, paclitaxel must be infused over a period of at least three hours.

We believe our technology may overcome many of the current limitations of paclitaxel by utilizing cardiolipin, a naturally occurring negatively charged lipid found in cardiac tissue, to increase the solubility of paclitaxel.  We have been able to standardize the preparation of cardiolipin through the development of a proprietary form of synthetic cardiolipin.  Using cardiolipin eliminates the need for administration of castor oil and ethanol and reduces the need for the accompanying premedication.  Since paclitaxel has a positive charge and cardiolipin has a negative charge, cardiolipin electrostatically combines with the paclitaxel to form a stable product that can be freeze dried and easily reconstituted.  Based on preclinical studies, we believe another potential advantage of LEP may be the ability of cardiolipin to overcome multi-drug resistance, which is the resistance to cancer drugs developed by cells which have been exposed to several rounds of chemotherapy.  As a result, we may be able to significantly increase the effectiveness of LEP against tumors, thereby maximizing the killing of otherwise resistant cells.

Development status.  LEP is being developed for various solid tumors. We believe LEP is the first, and only, liposomal form of paclitaxel to enter clinical trials.  Enrollment of patients in our Phase I/II clinical trials for LEP was completed in April 2000.  These Phase I/II trials involved the treatment of 31 cancer patients, none of whom were then responding to other forms of treatment. Our Phase I/II trials have provided evidence that LEP may be able to be administered at higher levels than paclitaxel is currently administered, with fewer side effects.  Although not designed to measure efficacy, six patients in the Phase I/II trial experienced tumor reductions greater than 35%.  The tumors in twelve other patients did not increase in size after 12 weeks, and in four of these twelve patients, the tumors were still stable in size one year later.  Some patients received significantly more cycles of LEP than can be given with unencapsulated paclitaxel, including two patients who received greater than 30 cycles of LEP. None of the patients showed signs of the nerve and muscle pain commonly associated with paclitaxel, and most patients did not experience the hair loss or nausea often associated with paclitaxel treatment.

Currently, our collaboration partner, Pharmacia[,] is initiating large scale multi-center, multinational Phase II/III clinical trials. These Phase II/III trials will assess LEP as both a single and combination therapy for a variety of solid tumors to determine its safety and efficacy.

(3)     The year 2000 was a breathrough year for NeoPharm ... our partner, Pharmacia, initiated Phase II/III clinical trials for Liposome Encapsulated Paclitaxel 'LEP,' for which we received a $3 million milestone payment."

(4)     [The Company] confirmed ... that the clinical development program for LEP ... is continuing in key oncology indications."

Proposed Amended Complaint, at ¶¶ 69-72.

Under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("the PSLRA"), a plaintiff must plead the falsity and materiality of a statement of fact with particularity. *Tellabs*, 437 F.3d at 595. Particularity has been described as "the who, what, when, where, and how: the first paragraph of any newspaper story." *Healthcare Compare*, 75 F.3d at 281 (citing *DiLeo* v. *Ernst & Young*, 901 F.2d 604, 627 (7th Cir. 1990)).

Plaintiffs allege that the four statements set out above were false and material at the time they were made because (1) LEP-s required sonication, rendering it less economically viable, among other problems; (2) LEP was NeoPharm's lead product in development; (3) LEP was "problematic from the beginning;" (4) "early testing" of LEP-s showed it could not be consistently reconstituted and it contained excess amounts of free paclitaxel, which rendered it unsafe, hurt its chances of becoming a successful product, and meant that it needed to be reformulated; (5) Pharmacia ran various tests on LEP-s that had some negative results; (6) Pharmacia had concerns about the viability of LEP-s; (7) NeoPharm and Pharmacia had a meeting in Italy in September 1999 at which they decided on "action items" to resolve problems with LEP-s; (8) Pharmacia decided to reformulate LEP in November 1999 and kept NeoPharm

informed of its efforts beginning in January 2000; (9) after a bad test result in November 1999, patients were pre-medicated before taking LEP; (10) Pharmacia considered placing a hold on the Phase I trials and eventually ended them in the summer of 2000; (11) Pharmacia began Phase II trials for LEP-ns relating to gastric, esophageal, and bladder cancer in late 2000; and (12) Pharmacia communicated some negative results of these trials to NeoPharm in March, April, and June of 2001. Proposed Amended Complaint, at ¶¶ 43-63.

Plaintiffs have alleged nothing that shows that statement (1) was false at the time that it was made. This statement concerned NeoPharm's business as a whole, and said only that NeoPharm had experienced some success in trials, planned to expand its infrastructure, and planned to place compounds in their liposomal system. None of plaintiffs' cited reasons for why the pre-class period statements were false directly addresses this statement or provides specific reasons why it was false when made, and plaintiffs thereby fail in their obligation to plead falsity with particularity. *In re Midway Games, Inc. Sec. Litig.,* 332 F. Supp. 2d 1152, 1163-71 (N.D. Ill. 2004) (Lefkow, J.). Furthermore, this statement is immaterial in that it is vague and not one on which investors would rely. *Tellabs,* 437 F.3d at 596 ("The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company. If the statement amounts to vague aspiration or unspecific puffery, it is not material."); *Davis* v. *SPSS, Inc.*, 431 F. Supp. 2d 823, 829 (N.D. Ill., 2006); *Midway Games,* 332 F. Supp. 2d at 1164 (N.D. Ill. 2004). Therefore, adding this statement would be futile because it is incapable of surviving a motion to dismiss. *See Blanchard* v. *Edgemark Fin. Corp.*, 2000 WL 33223385, at *2 (N.D. Ill. May 22, 2000) ("An amendment is futile where it is incapable of surviving a motion to dismiss.") (citing *General Elec. Capital*

23

*Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997); *Garcia* v. *City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994)). Plaintiffs are denied leave to reallege its falsity.

Statement (2) must be broken down into manageable parts in order to determine its significance. Plaintiffs should have done this in their complaint pursuant to the requirement that they state with particularity exactly which statements are alleged to be false and the court could deny their motion to amend as futile on that basis alone. *See Havenick* v. *Network Exp., Inc.*, 981 F. Supp. 480, 526 (E.D. Mich. Sept. 30, 1997) ("[plaintiffs compiled] a long list of block quotes, many of which contain statements that cannot seriously be regarded as false or misleading, and they line these statements up against a conclusory list of omissions and pronounce that fraud exists. Any notion of particularity and an underlying reason in light of the PSLRA certainly demands more than this.").

There appear to be no allegations that the first paragraph was false; in fact, plaintiffs included substantially the same statements as allegations of their complaint. Proposed Amended Complaint, at ¶¶ 40-41. Similarly, there is nothing in plaintiffs' complaint challenging the last paragraph of the statement, which describes Pharmacia's plans for future testing. In the second paragraph, only the sentence referring to LEP "as a stable product that can be freeze dried and easily reconstituted" is addressed by plaintiffs' allegations of falsity. *See* Proposed Amended Complaint, at ¶ 45 (referencing "early testing" of LEP-s that showed problems with the consistency of LEP's reconstitution); ¶¶ 47-49 (referencing 1999 tests conducted by Pharmacia in which there were problems with LEP's consistency); ¶ 51 (representatives of Pharmacia and NeoPharm met in September of 1999 and discussed "encapsulation issues"); ¶ 54 (Pharmacia had concerns regarding LEP's reproducibility); ¶¶ 55, 58-59 (alleging that "defendants" were aware

of Pharmacia's concerns and approved of Pharmacia's decision to reformulate LEP). Statement (2) was part of NeoPharm's 10-Q filing for the quarter ending on September 30, 2000.

Assuming only for the purpose of this decision that plaintiffs' complaint sufficiently alleges this statement's falsity, it would still not survive a motion to dismiss because plaintiffs have failed to adequately allege that it was made with the requisite scienter. It is possible that one could infer that because Pharmacia allegedly decided to reformulate LEP in November of 1999 based on issues with its reconstitution, and NeoPharm approved of that decision, that NeoPharm was aware of Pharmacia's concerns as of November 1999. This line of thinking is inappropriate in the context of the PSLRA, however; "[u]nlike a run-of-the-mill complaint, which will survive a motion to dismiss for failure to state a claim so long as it is 'possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief ... the PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading." *Tellabs*, 437 F.3d at 594. Without the benefit of inferences such as the above, plaintiffs have failed to create a strong inference that this statement was made with scienter. *See* 15 U.S.C. § 78u-4(b)(2). Plaintiffs provided only few and imprecise dates on which NeoPharm received any of the alleged information supporting the statement's falsity, and none of the allegations specify exactly what NeoPharm knew or was told, or *who* at NeoPharm had such knowledge. Alleging generally that NeoPharm was aware of Pharmacia's concerns is insufficient to allege scienter. *In re Abbott Labs. Sec. Litig.*, 813 F.Supp. 1315, 1318-19 (N.D. Ill. 1992).

The third paragraph of statement (2) generally touts the benefits that were observed in Phase I/II trials of LEP. It is evident that NeoPharm was referencing Phase I/II trials that it personally conducted, not those that Pharmacia conducted. This is because the referenced tests

had been over for more than one year at the time of the September 2000 statement, Proposed Amended Complaint, at ¶ 70 ("the tumors [of some patients] were still stable in size one year later"), and Pharmacia does not appear to have completed any Phase I testing on humans by September of 1999. Proposed Amended Complaint, at ¶¶ 47-48 (Pharmacia conducted experiments on animals in May through August of 1999); Defendants' Mem. Supp. Mot. Dismiss, Dkt. No. 35, at 2, 9 (November 11, 2002) (NeoPharm's Phase I testing of LEP began in September of 1998; NeoPharm conducted "its own Phase I clinical trials"). For the same reasons as mentioned above, plaintiffs' allegations are insufficient to raise a strong inference that defendants made these allegedly fraudulent statements with scienter, because they do not allege who at NeoPharm had any relevant knowledge, what Pharmacia told NeoPharm, or when.[8] Therefore, plaintiffs may not amend their complaint to reallege that this statement was false, because it would not survive a motion to dismiss.

Regarding statement (3), plaintiffs have also failed to provide a sufficient explanation for why it was misleading to say that Pharmacia *initiated* Phase II/III clinical trials for LEP and that NeoPharm received a $3 million payment. In fact, earlier in their proposed amended complaint,

---

[8] Plaintiffs' proposed amended complaint contains a paragraph that essentially subscribes to the practice of "group pleading." Proposed Amended Complaint, at ¶ 35 ("It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein – unless attributed to a specific defendant – are the collective actions of the narrowly-defined group of Individual Defendants identified above." *Cf. Chu,* 100 F. Supp. 2d at 836 ("plaintiffs maintain that 'it is appropriate to treat the Individual Defendants as a group for pleading purposes.'") While the court found that plaintiffs' allegations were sufficient as of its February 7, 2003 order, plaintiffs must keep in mind the Seventh Circuit's newly articulated standard in *Tellabs* in any further amendments to their complaint. *See Tellabs*, 437 F.3d at 604 ("While we will aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases.")

plaintiffs plead that "Through August 25, 2000, Pharmacia paid to NeoPharm $22 million, including the purchase of $8 million of NeoPharm common stock." Proposed Amended Complaint, at ¶ 42. Plaintiffs are also denied leave to reallege that this statement was false.

Statement (4) could also not survive a motion to dismiss, but for another reason: it is not material. Investors would not find the assertion that the clinical development program for LEP is "continuing in key oncology indications" to be a consequential fact about the company. *See Tellabs,* 437 F.3d at 596. The word "continuing" does not necessarily mean "succeeding." The general lack of specificity of this statement undermines the plaintiffs' argument that it served to buoy NeoPharm's stock price several months after its issuance. *See Searls* v. *Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995); *Last Atlantic Capital LLC* v. *Chicago Bd. Options Exchange, Inc.,* 455 F. Supp. 2d 788, 801 (N.D. Ill. 2006).

For all of these reasons, plaintiffs are denied leave to reallege that these pre-class period statements, which have already been dismissed with prejudice, were fraudulent. *See Wakeen* v. *Hoffman House, Inc.*, 724 F.2d 1238, 1244 (7th Cir. 1983) (affirming a district court's denial of leave to amend when "the proffered amendment merely restates the same facts using different language, or reasserts a claim previously dismissed.").[9]

3.     New Allegations from the Arbitration Decision and NeoPharm's Discovery

The majority of the text of plaintiffs' proposed amendments add factual allegations to flesh out the existing claims. These are based mostly on the findings in the arbitration decision,

---

[9] Defendants oppose the addition of the pre-class period statements based on the law of the case doctrine. The court has not considered the applicability of that doctrine, which could be an alternative basis for its finding, because leave to amend is denied on the merits of the proposed amendments.

with a minority coming from defendants' discovery production. Plaintiffs' Reply, at 1. Many of the proposed paragraphs to be added to the complaint are copied from the arbitration decision. *Compare* Proposed Amended Complaint, at ¶¶ 43-67 to Plaintiffs' Proposed Order, at 1-2.

While it may be appropriate to amend the complaint to conform to the results of discovery, the addition of 20 pages' worth of paragraphs copied in form or in substance from the arbitration decision is not the way to accomplish that, and it would waste judicial resources for the court to parse through the additions to separate the good additions from the bad. For reasons discussed above, many of the arbitrators' statements are not relevant or commutable to this case. Additionally, in this context it is inappropriate for plaintiffs to copy the arbitrators' findings instead of reviewing the underlying information and drafting allegations in their own words. *See Taubenfeld v. Career Ed. Corp.*, 2004 WL 554810, at *4 (N.D. Ill. March 19, 2004) (Lefkow, J.) (citing cases). Therefore, the court denies leave to add these additional allegations at this time.

IV.     Order

For the reasons stated above, plaintiffs' motion for summary adjudication of issues based on collateral estoppel and motion for leave to amend [#106] are denied. Pursuant to the court's order of August 18, 2005, Dkt. No. 130, discovery will cut off four months from the date of this order, which is June 22, 2007. This case will be called for status on March 8, 2007.

Dated: February 23, 2007                          ENTER:

                                                  JOAN HUMPHREY LEFKOW
                                                  United States District Judge